# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3687 | **DATE** | 2/26/2004 |
| **CASE TITLE** | FLENAUGH vs. AIRBORNE EXPRESS, INC. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Defendant's motion for summary judgment [18-1] is granted.   ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

03 01 04 date docketed

C.J. docketing deputy initials

2/26/2004 date mailed notice

PW mailing deputy initials

CB courtroom deputy's initials

U.S. DISTRICT COURT CLERK

'04 FEB 27 AM 3: 20

Date/time received in central Clerk's Office

Document Number

32

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAR 0 1 2004

KENDALL R. FLENAUGH,                    )
                                        )
                    Plaintiff,          )        No. 03 C 3687
                                        )
        v.                              )        Suzanne B. Conlon, Judge
                                        )
AIRBORNE EXPRESS, INC.,                 )
                                        )
                    Defendant.          )

## MEMORANDUM OPINION AND ORDER

Kendall R. Flenaugh ("Flenaugh") sues Airborne Express, Inc. ("Airborne Express") for race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991 ("Title VII"), 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981. Airborne Express moves for summary judgment on all claims pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.

## BACKGROUND

All facts are undisputed unless otherwise noted. Airborne Express operates locations in and around Chicago, and is party to a collective bargaining agreement with the International Brotherhood of Teamsters, AFL-CIO, Local No. 705 ("Local 705"). Def. Facts at ¶¶ 1-2. From August 31, 1998 until 1999, Flenaugh worked for Airborne Express as a part-time employee, doing dock work and delivering packages. Def. Facts at ¶¶ 5, 7. When he was hired, Flenaugh acknowledged he had received, read and understood his new hire packet that contained guidelines for on-the-job behavior and policies on equal employment opportunity, affirmative action and harassment. Def. Facts at ¶ 6. In 1999, Flenaugh became a casual driver, delivering

1

packages on an "as-needed basis." Def. Facts at ¶ 8. In 2001, Flenaugh started working on a full-time basis at Airborne Express' CHI facility. Def. Facts at ¶ 9. Among other things, his job duties required him to load and unload freight from his truck at the beginning and end of his shift, drop off and pick up customers' packages in a timely, professional and courteous manner, and track delivery attempts on Airborne Express' computer system. Def. Facts at ¶ 11.

In 2001, Airborne Express terminated Flenaugh on three separate occasions. In February 2001, Flenaugh was terminated after he ripped up paperwork and threw it at a supervisor. Def. Facts at ¶ 16. Flenaugh was later reinstated through a union grievance procedure. Def. Facts at ¶ 17. A few months later, a customer alleged that Flenaugh acted in a threatening manner in connection with a pick-up. Flenaugh was terminated, but was reinstated. Def. Facts ¶¶ 18-20, 22. A couple of months later, Flenaugh was terminated once again, this time for failing a drug/alcohol test. Def. Facts at ¶¶ 23, 27. Flenaugh was reinstated because the testing nurse did not perform a second test required by the collective bargaining agreement. Def. Facts ¶ 24. The testing nurse reported to Airborne Express that she did not conduct a second test because she felt threatened by Flenaugh's behavior. Id.[1]

---

[1]Flenaugh argues facts regarding his prior disciplinary record should be stricken from Airborne Express' Rule 56 statement because a collective bargaining agreement prohibits use of written warnings or discipline imposed nine or more months before termination. Pl.'s Resp. Def. Facts ¶¶ 12, 14, 16, 18, 22-23, 25-26, 28, 67, 108. Flenaugh misreads the collective bargaining agreement, which prohibits consideration of written warnings and discipline where nine months have elapsed without the employee receiving an additional warning or discipline for the offense. Def. Facts Ex. 5 at 30. Flenaugh was repeatedly disciplined and warned throughout 2001 and 2002 without a nine-month lapse. All underlying incidents concerned conduct of an unprofessional or threatening nature. Airborne Express also summarizes Flenaugh's October 2000 disciplinary record, but it is unclear whether these incidents of misconduct – as opposed to 2001 and 2002 incidents – played any role in the termination decision. The court therefore does not consider the 2000 disciplinary matter.

In late 2001 and early 2002, Airborne Express received three new customer complaints. One customer complained Flenaugh "was extremely rude and intimidating" and that she "found [her]self backing away from him because he was just downright nasty," while another complained that Flenaugh engaged in unprofessional conduct toward the customer's staff and clients. Def. Facts ¶¶ 29-30. Another customer reported that Flenaugh was "juvenile and ha[d] poor people skills," and that they "would be happy to never have to interact with [him] again." Def. Facts ¶ 31.

On June 5, 2002, Flenaugh returned to the CHI facility without attempting to deliver all of his required freight; he complained "he was tired of working 60 hours a week and [he] was not going to work anymore tonight."[2] Def. Facts ¶ 32. Flenaugh's supervisor told him that he must attempt delivery on all his freight. Def. Facts ¶ 33. According to Flenaugh's supervisor Joe Ortiz ("Ortiz") and manager Mark Simpson ("Simpson"), Flenaugh then became upset, retrieved a straight truck row bar, and violently shook and pointed it like a rifle. Def. Facts ¶ 34. Flenaugh then jumped on a dock forklift and drove it toward a group of supervisors, causing them to move behind a pillar for safety. Def. Facts ¶¶ 35-36. Flenaugh admits that he drove the forklift, but claims that he was not trying to hit anyone and that it "was their opinion that they should hide behind a pillar." Pl.'s Resp. Def. Facts ¶ 36. Flenaugh denies he picked up and pointed the straight truck row bar like a rifle. Pl.'s Resp. Def. Facts ¶ 34. Ultimately, Flenaugh returned to work, and attempted to make all remaining deliveries. Def. Facts ¶ 37. According to Simpson,

_____

[2]Flenaugh is deemed to have admitted this allegation because his denial was unsupported by record evidence.

3

he did not discipline Flenaugh in connection with this incident because he gave Flenaugh "the benefit of the doubt." Def. Facts ¶ 38.

The next day, June 6, Flenaugh again returned to the CHI facility without attempting to deliver all of his assigned freight. Def. Facts ¶¶ 39, 41; Pl. Resp. Def. Facts ¶ 39. The altercation that ensued resulted in Flenaugh's final termination. Airborne Express and Flenaugh's accounts of the altercation differ.

According to Ortiz, he had instructed Flenaugh to deliver all of his assigned freight before returning to the facility. Def. Facts ¶ 40. Despite that instruction, Flenaugh returned, claiming his scanner was malfunctioning. Def. Facts ¶¶ 39, 40. Upon his arrival, he began to unload the undelivered freight from his truck. Def. Facts ¶ 42, 44. Flenaugh was visibly upset, out of control, and used profanity. Def. Facts ¶ 44, Pl.'s Resp. Def. Facts ¶ 44. Flenaugh allegedly stated, "mother f*cker, ~~ [sic] don't f*ck with me right now . . . you don't want to f*ck with me, not today mother f*ckers"; and, "[y]ou want a reason to fire me mother f*cker? I'll give you a reason to fire me!" Def. Facts ¶ 45; Pl.'s Resp. Def. Facts ¶ 45. Ortiz repeatedly asked Flenaugh whether he intended to complete his deliveries. Def. Facts ¶¶ 43, 46. Flenaugh purportedly refused, became enraged and grabbed Ortiz's arm in a threatening manner. Def. Facts ¶ 48. Flenaugh then jumped on the dock forklift. Def. Facts ¶ 49. Ortiz claims he wrested the forklift keys from Flenaugh, fearing for the safety of other employees. Def. Facts ¶¶ 49-50. Flenaugh tried to grab the keys. Def. Facts ¶ 51. Ortiz then told Flenaugh he was terminated and asked the police to be called. Def. Facts ¶ 52. An allegedly irate Flenaugh then retrieved his golf clubs from his work truck, placed them on his shoulder, and threatened "you want to fire me mother f*cker? I'll give you a reason to fire me!" Def. Facts ¶¶ 53-54. At that point, Flenaugh

laughed, yelled obscenities, reached into a duffel bag in such a way that Ortiz and another supervisor believed Flenaugh had a gun; he pulled out a golf club and raised it on and off his shoulder. Def. Facts ¶¶ 55-56. This led Ortiz to believe that Flenaugh was threatening to hit him. Def. Facts ¶ 55. The police then arrived and arrested Flenaugh. Def. Facts ¶ 58.

According to Flenaugh, he returned to the CHI facility because he was sick, tired, and his father was sick. Upon returning, Flenaugh claims he apprised Ortiz and Andre Polk, his union steward, of this situation.[3] Pl.'s Resp. ¶¶ 39-41, Pl. Facts ¶ 173. When Polk asked Flenaugh if he needed a doctor,[4] Ortiz purportedly stated "I don't care what you say. You've got five minutes to get back on the truck and get out of here or I'm going to fire you. You've got four minutes, three minutes, two minutes, one minute. Kendall, you are terminated." Pl. Facts ¶ 173. Flenaugh denies refusing to return to work. Pl.'s Resp. Def. Facts ¶ 47. Instead, he maintains that he tried, but was unable to resume his deliveries before he was terminated. Pl.'s Resp. Def. Facts ¶ 47; Pl. Facts ¶ 176. Flenaugh contends Ortiz terminated him within five seconds of giving him five minutes to return to work. Pl.'s Resp. Def. Facts ¶ 46. Flenaugh denies almost all of Ortiz's contentions; he claims he did not use the term "mother f*cker," grab Ortiz's arm, struggle for the forklift keys, make any threatening statements, or use his golf clubs or duffel bag in a threatening manner. Pl. Resp. Def. Facts ¶¶ 45, 48, 50-51, 54, 55-56. Flenaugh admits, however, that he was visibly upset and out of control when he returned to the facility, he used

---

[3]Polk was present at Ortiz's request in order to notify Flenaugh as to the work hours authorized by the collective bargaining agreement. Pl. Facts ¶ 172.

[4]Polk purportedly sought to invoke company policy that medical attention cannot be denied if it is necessary. Pl. Facts. ¶175.

profanity, he touched Ortiz, he jumped on the forklift and reached for the keys, he retrieved his personal belongings from his work truck, placed his golf clubs on his shoulder, and was ultimately arrested.[5] Pl.'s Resp. Def. Facts ¶¶ 44- 45, 48, 50-51, 58.

After Flenaugh's arrest, Ortiz reported the incident to Simpson, who immediately conducted an investigation. Def. Facts ¶ 59. Simpson had authority to approve or rescind Ortiz's termination decision. Def. Facts ¶ 66. According to Simpson, his interviews of Polk, Ortiz, Craig McDonald ("McDonald"), Eric Stiverson ("Stiverson"), Miguel Sanchez ("Sanchez"), E. Debellete ("Debellete") and Melinda Caldwell ("Caldwell")[6] revealed that Flenaugh returned to the CHI facility on June 6 without attempting all of his deliveries, was visibly out of control and upset, attempted to drive a forklift unnecessarily, and ended up struggling with Ortiz over the forklift keys. Def. Facts ¶¶ 60-1, 64. Simpson claims that Ortiz, McDonald, Stiverson, Debellete and Caldwell reported that Flenaugh used profanity while arguing with Ortiz regarding his unattempted deliveries, and that Stiverson and Ortiz reported that Flenaugh yelled in a threatening manner, "[y]ou want to fire me mother f*cker? I'll give you a reason to fire me!" and reached into his duffel bag in such a way they believed him to have a gun. Def. Facts ¶¶ 61-2. According to Simpson, three witnesses – Ortiz, Stiverson, and McDonald – reported that Flenaugh raised a golf club on and off his shoulder in a threatening manner toward Ortiz, and that Sanchez showed him a phone he claimed Flenaugh had broken over his arm. Def. Facts ¶¶

---

[5]At Flenaugh's deposition, he was asked, "[d]id you carry the golf clubs on your shoulder and swing them towards Joe Ortiz?" He responded, "I carried the golf clubs around waiting for the police. Ortiz ran up to me. I am not sure what he is going to do to me or whatever; and out of reaction, the golf clubs came up off my shoulder." Def. Facts Ex. 1 at 125.

[6]McDonald, Caldwell and Debellete are African-Americans. Ortiz is Hispanic, and Stiverson is Caucasian. Def. Facts ¶ 61.

62, 64. Simpson maintains that only one witness – Polk – told him Flenaugh did not try to hit Ortiz with a golf club, but points out three other witnesses disputed Polk's version. Def. Facts ¶ 63. Based on these interviews, Simpson concluded Flenaugh assaulted Ortiz and Sanchez. Simpson approved the termination because of Flenaugh's extensive history of misconduct and threatening behavior, his conduct of June 5, and his investigation of the June 6 altercation. Def. Facts ¶ 67.

Flenaugh responds that Ortiz and Simpson are liars who should be disbelieved due to their history of discrimination against African-Americans. He cites Polk's deposition testimony contesting Ortiz's version of the altercation and Simpson's version of what Polk told him during the investigation.[7] Pl.'s Resp. Def. Facts ¶¶ 60-65, 67; Pl. Facts ¶¶ 182-193. Polk testified he did not see Flenaugh swing golf clubs at Ortiz, grab his arm, or struggle over the forklift keys, and did not hear Flenaugh say, "I'll give you something to fire me for." Pl. Facts ¶¶ 179, 182, 184, 185. Polk testified he did not tell Simpson that he heard Flenaugh yelling, "f*ck this and f*ck that", "hell no. I ain't sick. I don't need a hospital," or "I'm not going back on my route and you can't make me." Pl. Facts ¶¶ 190, 192. Finally, Polk testified he did not tell Simpson that he was at least thirty feet away from Flenaugh when he was on the forklift, that he had been trying to calm him down or that he threw Flenaugh's duffel bag into a van. Pl. Facts ¶¶ 191-192. Polk testified that he basically stepped in after a group of supervisors had irritated Flenaugh, backed

---

[7]Flenaugh also claims Simpson's confederate flag tattoo reveals his bias. Pl. Facts ¶ 248.

him into a corner, would not stop speaking to him, and would not give him a chance to calm down or relax.[8] Pl. Facts ¶ 177.

A week after Flenaugh's termination was approved by Simpson, Local 705 filed a grievance through the collective bargaining procedure; the grievance was denied after a hearing. Def. Facts at ¶¶ 68-69, 71. On May 1, 2003, Flenaugh filed a charge of discrimination with the EEOC, 328 days after the incident on June 6, 2002. Def. Facts at ¶¶ 72-73.

Flenaugh also claims his work environment was racially hostile throughout his employment because: (1) in 1999 or 2000, Airborne Express violated his seniority rights due to his race when a non-African American employee was given the opportunity to deliver packages instead of him; (2) in 1999, Airborne Express' human resources violated his seniority rights due to race by allowing 25-30 employees to be placed ahead of him on the seniority list; (3) in 1999, Airborne Express promoted another employee to full-time casual driver despite the fact they were hired at the same time; (4) in 1999, Airborne Express placed 25-30 employees in available casual jobs before him on the basis of his race and refused to change his seniority date; (5) in August 2001, Simpson harassed him after Simpson observed Flenaugh behaving in an incoherent manner; (6) in August 2001, he was not immediately paid for three days of work he missed after his alcohol test, a test non-African American employees were not administered; (7) in March 2002, Sanchez refused to allow him to leave work early despite the fact his father was dying; (8)

---

[8]Flenaugh proffers the deposition testimony of Charles Hall. Hall did not see Flenaugh try to board the forklift, try to take forklift keys from Ortiz, swing golf clubs at Ortiz, or otherwise act in a threatening manner. Pl. Facts ¶¶ 199-201. Hall saw Ortiz and another supervisor following Flenaugh and everyone fussing and cursing at each other. Pl. Facts. ¶198. It is undisputed Hall arrived after Flenaugh already had his golf clubs on his shoulder. Pl. Facts Ex. 10 at 9.

in June 2002, he was not immediately reimbursed for gas; (9) Airborne Express failed to pay him for Memorial Day on an unspecified date; and (10) Simpson pushed up his sleeve, showing Flenaugh a confederate flag tattoo on his arm with a clenched fist, while the two were alone on an unspecified date during a meeting in Simpson's office. Def. Facts ¶¶ 75-76, 80-83, 87, 89-90, 93, 97, 101; Pl. Facts ¶¶ 248-250.

## DISCUSSION

### I.      Standard of Review

Airborne Express is entitled to summary judgment if the record, viewed in the light most favorable to Flenaugh, shows there is no genuine issue of material fact and that Airborne Express is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Dyrek v. Garvey*, 334 F.3d 590, 597-98 (7th Cir. 2003); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court considers the record as a whole, taking Flenaugh's evidence as true and drawing all reasonable inferences in his favor. *Gennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). Entry of summary judgment is proper if Flenaugh has failed to make a showing sufficient to establish the existence of an element essential to his case. *Dyrek*, 334 F.3d at 597-98; *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548, 91 L.Ed.2d 265.

To survive a motion for summary judgment, Flenaugh must do more than merely demonstrate a factual dispute; he must offer evidence sufficient to support a verdict in his favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). This standard is applied with heightened rigor in employment discrimination cases, where issues of intent and credibility dominate. *See Greer v. Bd. of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001); *Shannon v. Sheahan*, No. 01 C 252, 2003 WL 366584 at *7 (N.D. Ill. Feb. 18, 2003). "The mere

existence of a scintilla of evidence in support of [Flenaugh's] position will be insufficient; there

must be evidence on which the jury could reasonably find for [Flenaugh]." *Anderson v. Liberty*

*Lobby Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II.    Title VII

A plaintiff must file a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") within 300 days "after the alleged unlawful employment practice

occurred." 42 U.S.C. § 2000e-5(e); *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir.

2001). In the case of unlawful termination, "[t]he 300-day limitations period begins to run from

the date that the employee is notified of termination." *Stark v. Dynascan*, 902 F.2d 549, 551 (7th

Cir. 1990).

Airborne Express terminated Flenaugh's employment on June 6, 2002. Flenaugh filed a

discrimination charge with the EEOC – 328 days later – on May 1, 2003. Flenaugh argues his

charge was timely because he filed within 300 days of being informed that his grievance of the

termination under the collective bargaining agreement was denied. However, grievance

proceedings do not toll the 300-day period. *International Union of Elec., Radio and Mach.*

*Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 236-37 (1976); *Williamson v. Ind. Univ.*, 345

F.3d 459, 462-63 (7th Cir. 2003); *Bottoms v. Illinois Dept. of Human Services*, 174 F. Supp.2d

758, 765 (N.D. Ill. 2001).

Flenaugh also argues his charge was timely because he was unaware that his termination

was discriminatory until July or August 2002, when he was informed that an Airborne Express

investigation revealed "rampant discrimination" by the managers responsible for his termination.

Pl.'s Opp'n at 8. Flenaugh's argument, seemingly grounded in the continuing violation theory or the doctrine of equitable tolling, misses the mark.

The continuing violation theory is inapplicable because at least one discriminatory act must occur within the 300-day period. *Stewart v. CPC International, Inc.*, 679 F.2d 117, 121 (7th Cir. 1982); *Shelton v. Ernst & Young, LLP*, 143 F. Supp.2d 982, 988 (N.D. Ill. 2001). Flenaugh has not asserted any discriminatory act committed after his June 6, 2002 termination date, let alone within the limitations period. Rather, Flenaugh maintains the limitations period should be tolled because he did not discover the discrimination until a month or two after his termination, when he was told "rampant discrimination" was uncovered during an Airborne Express investigation.

Under the doctrine of equitable tolling, "a plaintiff [is permitted] to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Wheeldon v. Monon Corp.*, 946 F.2d 533, 536 (7th Cir. 1991). Even if Flenaugh were unaware of purported discrimination until July or August 2002, equitable tolling does not save his Title VII claim. "[T]he court does not grant the plaintiff a fresh 300 days to file his charge once he obtains enough information to suspect discrimination; he must file his charge with the EEOC within a reasonable time." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268 (7th Cir. 1995). By Flenaugh's own admission, he waited nine or ten months after he was informed of "rampant discrimination" to file an EEOC charge. In the absence of justification, the delay was unreasonable. *Id.* (ten months unreasonable); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452 (7th Cir. 1990) (eight months unreasonable); *Juniel v. Park Forest-Chicago Heights School District 163*, 161 F. Supp.2d 910, (N.D. Ill. 2001) (several

months unreasonable). The only justification proffered by Flenaugh is that he was pursuing grievance proceedings in accord with the collective bargaining agreement. However, the limitations period is not tolled by grievance proceedings. Because Flenaugh's Title VII claim was not timely filed with the EEOC, Airborne Express' motion for summary judgment on Count I must be granted.

## III.    § 1981

Preliminarily, this court notes Flenaugh filed his complaint on May 30, 2003. The statute of limitations for § 1981 claims is two years, calculated from the date the complaint is filed. *Vore v. Indiana Bell Telephone Co., Inc.*, 32 F.3d 1161, 1162-63 (7th Cir. 1994); *Huynh v. Board of Education*, No. 01 C 2893, 2002 WL 500560 (N.D. Ill. 2002). Thus, conduct occurring prior to May 30, 2001 is time-barred for purposes of § 1981. Flenaugh's allegations with respect to racial discrimination in 1999 and 2000 regarding his seniority rights are clearly time-barred. Nevertheless, Flenaugh argues the incidents – even if time-barred – are relevant background information. The court is unconvinced. Flenaugh admittedly has no personal knowledge about the specific identity, employment history, or work experience of the non-African American employee who was allegedly assigned to package delivery instead of him or the seniority of the 25-30 employees allegedly placed in casual jobs before him. Def. Facts ¶¶ 75-79, 80-82. Instead, Flenaugh merely relies on his unsupported personal opinion that these actions were discriminatory in nature. *See Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim"). Flenaugh's contention that Airborne Express discriminated against him when it refused to change his seniority date is similarly flawed. Flenaugh admits Airborne

12

Express' conduct may be excused as an oversight or mistake. *Abioye v. Sunstrand Corp.*, 164 F.3d 364, 367 (7th Cir. 1998) (conjecture and speculation regarding an employer's motives may not be used to defeat summary judgment).

## 1. Race Discrimination

Flenaugh contends he was terminated in violation of § 1981 due to his race. Section 1981 claims are analyzed using the framework developed under Title VII. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999). Because Flenaugh has pointed to no direct evidence of discrimination, he relies upon circumstantial evidence under the burden-shifting method outlined in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If Flenaugh presents a *prima facie* case, the burden of production shifts to Airborne Express to "articulate some legitimate, nondiscriminatory reason" for Flenaugh's termination. *Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1032 (7th Cir. 1998) (citations omitted). If Airborne Express articulates a legitimate reason, the burden shifts back to Flenaugh to prove by a preponderance of the evidence Airborne Express' proffered reason was a pretext for discrimination. *Id.* Flenaugh retains the ultimate burden to prove intentional discrimination.

### A. *Prima Facie* Case

To establish a *prima facie* case, Flenaugh must show that: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside the classification more favorably. *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 744 (7th Cir. 2002). Flenaugh clearly meets the first and third requirements because he is African-American and he was terminated. However, Flenaugh has not established the second and fourth elements: he fails to

13

show he satisfied Airborne Express' legitimate expectations or that similarly situated employees outside his protected class were treated more favorably.

Flenaugh claims that he performed his job in accordance with Airborne Express' legitimate expectations. The only support for Flenaugh's claim is his own testimony and that of two former co-workers for the proposition that he was a "hard worker" performing "above and beyond the call of duty." Pl. Facts ¶ 219. This testimony is insufficient to create a genuine issue of material fact. *Armstrong v. United Airlines, Inc.*, 883 F.Supp. 1172 (N.D. Ill. 1995) (the perceptions of plaintiff and other employees are irrelevant to issue of whether plaintiff was performing his duties to the expectations of his employer; "the relevant expectation is the expectation of the employer"); *Cecilio v. Allstate Ins. Co.*, 908 F.Supp. 519, 530 (N.D. Ill. 1995) (the perceptions of plaintiff, a supervisor, and three co-workers were insufficient to create a genuine issue of material fact as to whether plaintiff met employer's legitimate expectations). At the time of his termination, Flenaugh's performance record was riddled with customer complaints and disciplinary actions relating to unprofessional and threatening behavior. Just one day before his termination, Flenaugh neglected to perform his job duties, failing to attempt delivery on all his required freight and complaining that "he was tired of working 60-hours a week and [he] was not going to work anymore [that night]." Def. Facts ¶ 32. Based on his own admissions, Flenaugh cannot prove he met Airborne Express' legitimate expectations when he was terminated. Nor does Flenaugh present evidence casting doubt on the honesty of Simpson's belief that Flenaugh assaulted Ortiz and Sanchez and that termination was warranted in light of his performance record. *Monley v. Q Int'l Courier, Inc.*, 128 F. Supp.2d 1155, 1160 (N.D. Ill.

2001) (court need not consider whether plaintiff establishes a *prima facie* case where he does not show employer's legitimate, nondiscriminatory reason is pretextual).

Flenaugh also contends that similarly situated employees outside his protected class were treated more favorably because Ortiz, Lechtenburg, and Stiverson were accused of confrontations or batteries, but were not terminated. Ortiz, Lechtenburg, and Stiverson are all non-African American. Flenaugh's argument is flawed. All of these employees were supervisors. Accordingly, they are not similarly situated to Flenaugh. *Connolly v. Ala Carte Entertainment, Inc.*, No. 02 C 0492, 2002 WL 31248497 (N.D. Ill. 2002) ("supervisors and superiors are not similarly situated to subordinates") (citing *Rodriguez v . Motorola, Inc.*, 2001 WL 968651, * 6 (N.D. Ill. 2001); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993); *Jackson v. Northwestern Ill. Univ.*, 2000 WL 1853331, *3 (N.D. Ill. 2000)). Moreover, even if these employees were not supervisors, Flenaugh fails to present any evidence as to their comparability to him with respect to overall performance and conduct, *e.g.*, customer complaints and extensive disciplinary record for threatening behavior. *Snipes v. Illinois Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002). Absent evidence that similarly situated non-African-American employees were treated more favorably, Flenaugh cannot establish a *prima facie* case of race discrimination.

### B.    Pretext

Even assuming the *prima facie* elements have been met, Flenaugh's race discrimination claim is doomed by his failure to show pretext.[9] Airborne Express maintains Flenaugh was

---

[9]Because Airborne Express has articulated a legitimate, nondiscriminatory reason for terminating Flenaugh, the court proceeds directly to the pretext prong of the *McDonnell Douglas* test. *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1392, 1404 (7th Cir. 1996).

terminated because of his extensive history of repeated misconduct, customer complaints about threatening behavior, and the misconduct of June 5th and 6th. Flenaugh may show pretext by establishing Airborne Express' purported reasons (1) had no basis in fact; (2) did not actually motivate the termination; or (3) were insufficient to motivate the termination. *Alexander v. CIT Technology Financing Servs.*, 217 F. Supp.2d 867, 889 (N.D.Ill. 2002). In evaluating pretext, the court is restricted to the question of whether Airborne Express held an honest belief about the reasons for its termination decision. *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 627 (7th Cir. 2001); *Sirvidas,* 60 F.3d at 378; *Mora v. Chicago Tribune*, 57 F. Supp.2d 626, 634-35 (N.D. Ill. 1999), *aff'd* 215 F.3d 1330 (7th Cir. 2000). The court will not "sit as a kind of 'super-personnel department' weighing the prudence of employment decisions," or evaluating whether personnel decisions are wise, fair or correct. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997).

It is irrelevant whether Flenaugh actually assaulted Ortiz and Sanchez. Simpson made the ultimate decision that Flenaugh's employment would be terminated. Flenaugh is required to present evidence casting doubt on the honesty of Simpson's *belief* that Flenaugh assaulted Ortiz and Sanchez and that termination was warranted in light of Flenaugh's poor disciplinary and performance record. *Mora*, 57 F. Supp.2d at 634-35. Flenaugh cannot rely on the testimony of Airborne Express employees at the ORD (O'Hare) and CHI facilities about discriminatory acts purportedly committed by Ortiz, Stiverson, and Sanchez for purposes of showing that they lied about the altercation. Pl. Facts ¶¶ 120, 123, 124-162, 202, 211-217, 220-224, 227-228, 241-243. That testimony is irrelevant to the issue of pretext. Flenaugh is required to proffer evidence

Simpson did not honestly believe that Flenaugh's termination was warranted based on the results of his investigation into the altercation.

Flenaugh attempts to assail the sincerity of Simpson's belief by relying on evidence of Simpson's purported racial bias against African-American employees. However, Flenaugh's underlying evidence is deficient as a matter of law. First, even assuming Simpson's confederate flag tattoo is evidence of racial bias, Flenaugh has failed to connect that bias to his termination. *Gorence v. Eagle Food Ctrs. Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[B]igotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action"). Second, the incident report filed by Millicent Shields complaining of Simpson's conduct with respect to African-American employees is unauthenticated, and may not be considered for purposes of summary judgment. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Third, the testimony of Thaddeus Tucker and Neil Williams about Simpson's purported racial bias against African-American employees is, at best, conclusory. *Cf. Drake v. Minnesota Mining & Manufacturing Co.*, 134 F.3d 878, 887 (7th Cir. 1998). Finally, Darnell Burnett's statement to Flenaugh that the corporate office determined that Simpson created a racially charged environment at the CHI facility in July or August of 2002 is inadmissible hearsay that cannot be considered on summary judgment. *Elsenstadt v. Centel Corp.*, 113 F.3d 738, 741 (7th Cir. 1997).

Flenaugh attacks the honesty of Simpson's belief by contesting specific investigatory conclusions, *i.e.*, that Flenaugh assaulted Ortiz and Sanchez. He asserts that Simpson's findings are undermined by Polk's deposition testimony. However, these purported contradictions are insufficient to show pretext. Flenaugh does not dispute that three witnesses – Ortiz, Stiverson,

and McDonald – contradicted Polk's version of the altercation, telling Simpson that Flenaugh raised a golf club on and off his shoulder in a threatening manner toward Ortiz. The fact that Polk contradicted their version of the altercation does not call into question the reasonableness of Simpson's belief Flenaugh assaulted Ortiz and Sanchez, especially considering Flenaugh's disciplinary record. *Giannopoulos*, 109 F.3d at 407-409. Moreover, Polk did not testify that Simpson lied. He simply testified that Simpson's record of their meeting was inaccurate in two minor instances. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (stating that pretext is not a mistake, but a lie).

Nor can Flenaugh salvage his claim by pointing to Ortiz, Stiverson, and Lechtenberg as non-African American employees who were not terminated despite engaging in confrontations or batteries. Supervisors are not similarly situated to subordinate employees. *Connolly*, 2002 WL 31248497 at * 5. In sum, the court finds that Airborne Express' legitimate, nondiscriminatory reasons for terminating Flenaugh are not a pretext for race discrimination. Flenaugh has failed to cast doubt on Simpson's honest belief that termination was warranted in light of Flenaugh's long history of threatening and unprofessional misconduct, numerous customer complaints about him, and his misconduct on June 5 and 6. Accordingly, Airborne Express is entitled to summary judgment with respect to this portion of Flenaugh's § 1981 claim.

## 2. Hostile Environment

Hostile environment harassment is prohibited by § 1981. To be actionable, Flenaugh must establish that the harassment was "sufficiently severe or pervasive to alter the conditions of the [his] employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). Whether harassment is sufficiently severe and pervasive is dependant upon

the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Harassment must be objectively and subjectively hostile; Flenaugh must show a reasonable person would find the harassment hostile or abusive, and that he himself found it to be so. *Gentry v. Export Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001).

As noted by Airborne Express, Flenaugh never complained to either Local 705 or Airborne Express that he was harassed, despite the fact that he acknowledged receiving and reading the discrimination and harassment policies. This failure to complain is strong evidence that Flenaugh did not subjectively perceive the environment to be hostile. *Rogers v. City of Chicago*, No. 00 C 2227, 2001 WL 1665157 (N.D. Ill. 2001); *Nelson v. Foster Wheeler Constructors, Inc.*, No. 97 C 4658, 1998 WL 792474 (N.D.Ill. 1998) (citing, *Gleason v. Mesirow Financial, Inc.*, 188 F.3d 1134, 1143 (7th Cir. 1997)).

Even if Flenaugh found his environment subjectively hostile or abusive, six or seven alleged incidents do not objectively constitute actionable harassment. An objectively hostile environment is one that a reasonable person would find hostile or abusive. *Gentry*, 238 F.3d at 850. Flenaugh concedes he was allowed to leave work early because of his father's illness in March 2002, he was paid for the days of work missed due to his failure of the alcohol test in August 2001, he was reimbursed for the June 2002 gas expense, and he was paid for the unspecified Memorial Day holiday. Def. Facts ¶¶ 87-88, 90-92, 97-100, 101-102. Nor can Flenaugh rely on his suspicions that non-African American employees under the influence of alcohol were not required to undergo testing as evidence of harassment; there is no evidence that

19

management knew any of these employees were under the influence of alcohol and failed to test them. *Cf. Caratachea v. Homewood Industries*, No. 01 C 9845, 2002 WL 31844997 (N.D. Ill. 2002) (plaintiff must establish employer had knowledge of misconduct committed by similarly situated employees to sustain liability); *Mora*, 57 F. Supp.2d at 636, n. 6 (employer cannot exercise discipline if it does not know of the misconduct). Thus, Flenaugh's harassment claim is based entirely upon two separate, isolated incidents involving Simpson – that he purportedly displayed his confederate flag tattoo in Flenaugh's face, and he allegedly harassed Flenaugh after observing him behaving in an incoherent manner. These two incidents are insufficient to create an objectively hostile or abusive environment. *Smith v. Rush Presbyterian-St. Luke's Medical Center*, No. 01 C 4971, 2002 WL 458972 (N.D. Ill. 2002). "The workplace that is actionable is the one that is hellish." *Id.* (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (internal quotations omitted)). Because Flenaugh fails to raise a genuine issue of material fact with respect to his hostile environment claim, Airborne Express is entitled to summary judgment on this portion of his § 1981 claim as well.

## CONCLUSION

Airborne Express is entitled to summary judgment on all claims as a matter of law.

February 26, 2004

ENTER:

Suzanne B. Conlon
United States District Judge

20